IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

UNITED STATES OF AMERICA      )
           )
     v.           )     CRIMINAL NO. 2:24-cr-28-004
           )
PEDRO RAUL ZEQUEIRA ALVAREZ   )
           )
a/k/a/ "Yery Yery"          )
           )
     Defendant.     )

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING AND MOTION FOR ACCEPTANCE OF RESPONSBILITY DECREASE

The United States of America, by and through its attorneys, Erik S. Siebert, United States Attorney for the Eastern District of Virginia, Kristen S. Taylor, Assistant U.S. Attorney, and Ben Tonkin, Trial Attorney, United States Department of Justice, Violent Crime & Racketeering Section, offers the following with respect to the sentencing factors under 18 U.S.C. § 3553(a) and the U.S. Sentencing Guidelines ("USSG" or "guidelines") for defendant Pedro Raul Zequeira Alvarez (hereinafter, "the defendant").

There is currently one outstanding objection to the defendant's Presentence Investigation Report.

The PSR's advisory guideline range is 41 to 51[1] months of imprisonment, resulting from a total offense level of 22 and a criminal history category of I. Final PSR, Dkt. No. 260 ("PSR") ¶¶ 66-67. The government submits that a sentence within the advisory guideline range would be sufficient but not greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

---

[1] If this Court were to sustain the government's objection, the advisory guideline range would become 51-63 months.

## I.        Procedural Background

On April 17, 2024, the defendant was charged in a two-count Indictment charging him with Racketeer Influenced and Corrupt Organizations (RICO) Conspiracy, in violation of 18 U.S.C. § 1962(d), and Conspiracy to Launder Monetary Instruments in violation of 18 U.S.C. §§ 1956(a)(1)(ii) and (h).  PSR ¶ 1.

On January 10, 2025, the defendant pled guilty to Count one of the Indictment, pursuant to a plea agreement. PSR ¶ 2.

On April 1, 2025, the U.S. Probation Office ("USPO") filed the initial Pre-Sentence Investigation Report ("PSR"), which calculated the defendant's total offense level as 24 and his criminal history category as I, resulting in a guidelines range of 51-63 months. Dkt. No. 247 ("Initial PSR").

On April 23, 2025, the government objected to the defendant not receiving a two-level increase for sophisticated means. On May 13, 2025, the defendant objected to the defendant being attributed with a loss amount of more than $3,500,000, arguing that it overstated his role in the scheme. After conferencing, the government agreed to reduce the defendant's loss amount to between $1,500,000 and $3,500,000, resulting in a two-level reduction to the defendant's total offense level. The parties were not able to reach an agreement regarding application of the sophisticated means enhancement, and thus, the government's objection remains unresolved. Furthermore, the PSR's calculation of the total offense level and advisory guideline range does not currently reflect the enhancement at issue.

## II.       The Government's Unresolved Objection to the PSR

   a. *This Court should sustain the government's objection and apply and sophisticated means enhancement pursuant to U.S.S.G. § 2B1.1(b)(10)(C).*

As set forth in the PSR, the government maintains that the defendant's role in traveling to various locations throughout the United States and cashing out cloned cards at numerous retail stores for close to a year satisfies the standard for application of the sophisticated means enhancement pursuant to 18 U.S.C. § 2B1.1(b)(10)(C).

"Pursuant to USSG § 2B1.1(b)(10)(C), a defendant receives a two-level sentencing enhancement for an offense that involves 'sophisticated means' if 'the defendant intentionally engaged in or caused the conduct constituting sophisticated means[.]'" *United States v. Chisholm*, 652 F. App'x 196, 199 (4th Cir. 2016) (quoting USSG § 2B1.1(b)(10)(C)). "Thus, the sophisticated means enhancement applies when a defendant employs 'especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.'" *Id*. (quoting USSG § 2B1.1 cmt. n.9(B)). "'For example, in a telemarketing scheme, **locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means**.'" *Id*. (emphasis added). "'The court need only find the presence of **efforts at concealment that go beyond (not necessarily far beyond ...) the concealment inherent in ... fraud**." *Id.* (quoting *United States v. Jinwright*, 683 F.3d 471, 486 (4th Cir. 2012)) (emphasis added).

The defendant pled guilty to being a member of criminal enterprise engaged in gas pump skimming operations throughout the United States. The Enterprise had a tiered structure, a profit-sharing mechanism, and a complex, multi-step process through which its members acquired stolen credit and debit card data, generated fraudulent proceeds, concealed their conduct through use of multiple retail establishments, transported proceeds in interstate commerce, and laundered the proceeds to generate usable funds.

The defendant was a working member of the Enterprise. Accordingly, he, along with his co-conspirators traveled from Miami to various locations throughout the United States to conduct cash-out operations. Plans to travel to various locations were generated by leadership, but **carried out** by working members of the Enterprise, i.e., the defendant.

In his statement of facts, the defendant agreed that as part of these operations, "to minimize the number of transactions made with the stolen track data and to evade detection, enterprise members and associates purchased large quantities of gift cards and expensive items" and then "sold these items below market value to fences who paid cash". Dkt. No. 200 at ¶¶ 24-25. This is, in fact, how working members of the enterprise were paid. It goes without saying, that all members of the enterprise received some form of profits as a result of their participation in this conspiracy, thereby directly participating in the complex profit-sharing mechanism described above.

Thus, even if this defendant's participation in the enterprise was limited[2] to conducting cash-out operations, those operations were intrinsically sophisticated. Certainly, the way in which enterprise members, including the defendant, went about committing access device fraud and other fraud offenses, and simultaneously concealing that conduct went above and beyond what was necessary to effectuate and conceal those types of financial crimes. This is evident in the fact that this enterprise successfully operated for approximately a decade. The defendant was part and parcel of this complex conduct, and albeit not a leader, should receive the same two-level sophisticated means enhancement that each of his co-conspirators have and will receive as part of their guideline calculations. For all these reasons, it is appropriate for this Court to apply the two-

---

[2] Notably, the PSR indicates that a Confidential Witness stated during an interview that while the defendant was not one of the most heavily involved members of the gas pump skimming organization, **the activity alleged in the Indictment regarding the defendant is true**. The Indictment alleges that the defendant participated in more than just cash-out operations as part of his involvement in the charged conspiracy.

level sophisticated means enhancement and hold this defendant accountable for the same level of conduct each of his co-conspirators have and will account for at their respective sentencing hearings.

**III.    Motion to Grant the Defendant Additional One-Level Decrease for Acceptance of Responsibility**

The defendant has assisted authorities in the investigation and prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the Court to allocate their resources efficiently.  USSG § 3E1.1(b).  The PSR has properly applied a two-level decrease in his offense level for acceptance of responsibility under U.S.S.G. § 3E1.1(a), and the defendant's offense level prior to the operation of that section is level 16 or greater. Accordingly, the United States moves this Court to apply an additional one-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b).  This reduction is already reflected in the PSR's offense level calculation.  PSR ¶ 43.

**IV.    Standards Governing Sentencing**

In fashioning a criminal sentence, a district court must "first calculate the applicable [U.S. Sentencing] Guidelines range." *United States v. Pauley*, 511 F.3d 468, 473 (4th Cir. 2007).  After calculating the guidelines range, the district court "must give both the government and the defendant 'an opportunity to argue for whatever sentence they deem appropriate.'" *Id*. (quoting *Gall v. United States*, 552 U.S. 38, 49 (2007)).  The district court must then consider all of the factors set forth in 18 U.S.C. § 3553(a) to determine whether those factors support the sentence requested by either party. *Id*. (citing *Gall*, 552 U.S. at 49).  The court "must make an individualized assessment based on the facts presented."  *Gall*, 552 U.S. at 50.

In the event that the district court imposes a sentence outside the guidelines range, it "must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Pauley*, 511 F.3d at 473 (quoting *Gall*, 552 U.S. at 50). After deciding an appropriate sentence, the court "must adequately explain the chosen sentence to allow for meaningful appellate review and to promote the perception of fair sentencing." *Gall*, 552 U.S. at 50. The Fourth Circuit has also held that "a sentencing court must address the parties' nonfrivolous arguments in favor of a particular sentence, and if the court rejects those arguments, it must explain why in a sufficiently detailed manner to allow this Court to conduct a meaningful appellate review." *United States v. Blue*, 877 F.3d 513, 519 (4th Cir. 2017). The Fourth Circuit considers "[a] within-Guidelines range sentence [] presumptively reasonable." *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017).

## V.     The Statutory Sentencing Factors

### A.  The Nature and Circumstances of the Offense (18 U.S.C. § 3553(a)(1))

The defendant was a member of a criminal enterprise that engaged in gas pump skimming operations throughout the United States. PSR ¶ 22. Gas pump skimming operations include but are not limited to scouting locations for installation of skimming devices, monitoring skimming devices, retrieving track data from skimming devices, creating cloned credit and debit cards using track data from skimming devices, cash out operations, and using fences to exchange illicit goods for cash. *See id*. The defendant was a member of the enterprise beginning in or about May 2018 and continuing through in or about July 2019. *See id*. While a member of the enterprise, the defendant took numerous trips to conduct skimming operations as defined above. *See id*. Some of these trips are outlined in the overt acts highlighted in the defendant's statement of facts.

The defendant and his co-conspirators specifically used cloned cards to conduct cash out operations, and then transported fraudulently obtained gift cards, cash, and other goods over state lines back to Miami. *See id*.  The defendant repeated this conduct as a member of the conspiracy for over a year. During time frame, the enterprise flourished. Even after the government's concession as to loss amount, the defendant is still attributed with over $1.5M in losses. PSR ¶ 26. The defendant is also responsible for recruiting at least one member, Luis Diaz, to the enterprise. PSR ¶ 22.

While the defendant was a member of the enterprise, 13,831 unique card numbers were exchanged by e-mail accounts attributable to the enterprise. PSR ¶ 26. This number represents thousands of individuals whose identities and finances were compromised during the year this defendant engaged in criminal activity on behalf of this enterprise. Financial losses aside, this number further represents countless hours of panic, stress, and inconvenience on the part of individual citizens who happened to pump gas at locations targeted by this enterprise. This massive figure should not be discounted by this Court.

While records of the enterprise's travel, internet searches, and email correspondence provide a broad overview of their conduct, a closer look at the group's conduct on the Eastern Shore provides a more detailed view of the damage the defendant and his coconspirators caused. In April 2018, law enforcement located and retrieved skimming devices placed by members of the enterprise at two gas pumps in Northampton County. The investigation revealed that from April 21, 2019 to April 22, 2018, the enterprise hit at least 19 different locations, mostly Harris Teeter grocery stores, to use the cloned credit cards they had created. In that short period of time, the defendant and his co-conspirators generated over $100,000 in actual/attempted loss, typically by

purchasing $500 gift cards or making cash-back transactions of hundreds of dollars. *See* Government Exhibit 1.

Therefore, all these factors considered, the nature and circumstances of the defendant's offense demands a substantial sentence.

B.  The History and Characteristics of the Defendant (18 U.S.C. § 3553(a)(1))

The defendant is 35 years old and was born in Camaguey, Cuba, where he lived until 2016. PSR ¶ 51-53. He was raised by his mother and father in Cuba, where he reports having a "perfect" childhood. PSR ¶ 51. He now lives in Miami, with his fiancée. PSR ¶ 55. The defendant's parents and half-sister immigrated to the United States and live in Miami. PSR ¶ 52-53. He is a lawful permanent resident of the United States. PSR ¶ 54. The defendant reports no alcohol or substance abuse issues, other than having tried cocaine several years ago. PSR ¶ 59.

The PSR reflects a criminal history score of zero, resulting in a Criminal History Category I. PSR ¶ 67. Accordingly, the defendant technically meets the criteria for a two-level reduction pursuant to U.S.S.G. USSG §§ 4C1.1(a)(1)-(10). PSR ¶ 41.

That said, while the defendant has no prior *convictions* at this time, this Court should consider that his record is by no means devoid of criminal conduct and/or meaningful contact with law enforcement. Notably, the defendant, along with co-defendant Luis Diaz, was arrested in Placer County, California, for conduct related to gas-pump skimming in 2018. PSR ¶ 24. He was convicted of Conspiracy, served 61 days in jail, and was sentenced to 2 years' probation. In November 2021, the charge was reduced to a misdemeanor, and the defendant was dismissed from probation. PSR ¶ 46. This prior law enforcement encounter is significant primarily because criminal history has a direct correlation with risk of recidivism. The Sentencing Commission examined the relationship between rearrests and the total number of criminal history points and

8

confirmed that offenders with more extensive criminal histories had higher rearrest rates. *See*

*Recidivism       of       Federal       Offenders       Released       in       2010*

https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-

publications/2021/20210930_Recidivism.pdf (hereinafter, "Recidivism Report") at pp. 25-28.

> In its 2016 Recidivism Overview Report and its 2017 Recidivism Criminal History
> Report, the Commission reported the lowest recidivism rates among offenders with
> zero criminal history points (30.2%), a sharp increase for offenders with one
> criminal history point (46.9%), and a generally steady increase in recidivism with
> each additional criminal history point.

Recidivism Report at p. 27, n. 72 (citing 2016 Recidivism Overview Report, *supra* note 3, at 18;

2017 Recidivism Criminal History Report, supra note 8, at 7). Also, notably, "one-fifth (20.3%)

of zero-point offenders with no prior contact with the criminal justice system were rearrested

during the study period." *Id* at p. 28. "In comparison, nearly one-third (32.7%) of zero-point

offenders with prior contact were rearrested." *Id*. All this suggests that prior contact with law

enforcement matters when it comes to evaluating the likelihood of recidivism.

The defendant's history and characteristics, therefore, support the government's request for a

guideline sentence. The defendant appears to have enjoyed significant family support, both

growing up in Cuba and here in the United States. And, instead of making the best of his

opportunities, he has decided to participate in a large-scale fraud scheme at the great expense of

law-abiding American citizens.

C. <u>The Need to Reflect the Seriousness of the Offense, to Promote Respect for the Law, and
to Provide Just Punishment (18 U.S.C. § 3553(a)(2)(A))</u>

The sentence imposed must adequately capture the seriousness of the offense conduct in this

case, promote respect for the law, and provide just punishment. To do so, this Court must consider

the impact the criminal enterprise, of which the defendant was an active and thriving member, had

on law-abiding citizens throughout this district and all over the country. The enterprise charged in

this case employed sophisticated tactics that enabled them to systematically and covertly steal from thousands of unwitting individual victims pumping gas in their hometowns or traveling interstate.

This Court should consider the effect of one's identity being compromised on an individual victim, let alone thousands of victims over a sustained period of time. The enterprise charged in this case made a living at others' great expense. Furthermore, the way in which the enterprise operated made them very difficult to detect by local law enforcement agencies, which explains why it took a federal RICO prosecution to capture the nationwide scope of its conduct. This also means that the conduct captured by this case is largely historical, which makes identifying individual victims for purposes of restitution at best very difficult, and at worst, impossible. The defendant and his co-conspirators' sentences must account for these considerations.

D.  The Need to Afford Adequate Deterrence & to Protect the Public from Further Crimes (18 U.S.C. § 3553(a)(2)(B), (C))

General deterrence should be a significant factor for this Court's consideration in this case. The large-scale theft of individuals' personally identifiable information through gas pump skimming is an ongoing problem throughout the country, and the prevalence of credit card fraud and its impact on both individual victims and financial institutions cannot be overstated. Sixty-two percent of credit card holders have been victimized by fraud, with annual losses exceeding $6.2 billion annually. *See* Brett Cruz, *2025 Credit Card Fraud Report and Statistics*, Jan. 27, 2025, https://www.security.org/digital-safety/credit-card-fraud-report/. Yet, fraudsters like the defendant often go unpunished: only 10 percent of fraudulent charges are actually reported to law enforcement. *See id.* As discussed above, this type of conduct largely goes unadjudicated, in part, because the actors move in and out of locations quickly to avoid detection by law enforcement, making it very difficult for local law enforcement agencies to make victims whole. This

10

defendant's sentence must be substantial enough to send a message to those engaged in similar conduct that if caught, the penalties will be severe.

E.    The Kinds of Sentences Available (18 U.S.C. § 3553(a)(3))

The available statutory sentence for Count One, a violation of 18 U.S.C. § 1962(d), is up to 20 years of imprisonment. *See* 18 U.S.C. § 1963(a).  A sentence of probation is not authorized by the guidelines but is statutorily authorized for not less than one and up to five years.  18 U.S.C. § 3561(c)(1).  A term of supervised release may be imposed for up to three years.  18 U.S.C. § 3583(b)(2).

F.    The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(6))

The government is requesting a sentence within the advisory guidelines range, which would serve to avoid unwarranted disparities with similarly situated defendants.  *See United States v. Franklin*, 785 F.3d 1365, 1371 (10th Cir. 2015) ("The purpose of the sentencing guidelines is 'to eliminate disparities among sentences nationwide.'" (quoting *United States v. Zapata*, 546 F.3d 1179, 1194 (10th Cir. 2008))); *United States v. Parks*, Criminal Action No. 5:05-CR-00257-KDB-DCK, 2020 WL 6826214, at \*3 (W.D.N.C. Nov. 20, 2020) ("One of the goals of the Sentencing Guidelines is to avoid national sentencing disparities amongst similar offenders with similar criminal conduct.  *See, e.g.*, *United States v. Johnson*, 445 F.3d 339, 343 (4th Cir. 2006).  Thus, the best way to avoid unwarranted sentencing disparities is for the district court to impose a sentence within the guidelines range.").

As reflected in the PSR, nine individuals were previously convicted of Conspiracy to Commit Bank Fraud in a related matter. *See US v. Pedro Duran, et al*., 2:19-cr-109; PSR ¶¶ 13-21. This related matter involved members of the same criminal organization who traveled to the Eastern District of Virginia in or about April 2018 to conduct a skimming operation.

The individuals who pled guilty in the previous were charged with approximately one months' worth of skimming activity. Unfortunately, at that time, law enforcement was unaware of the far-reaching scope of the organization's activities. Despite spending only a short time here in EDVA in April 2018, the defendant and his co-conspirators charged in *US v. Duran et al.* managed to generate a significant amount of loss, ranging from approximately $245,000 to $570,000, depending on each individual defendant's involvement. The nature of the previous investigation also enabled law enforcement to tie specific transactions using victims' PII to individual defendants, making it much easier to reliably calculate loss.

Yasmani Qujiada, one of the enterprise's leaders, was also convicted and sentenced to a total of 10 years' incarceration in the previous case. He was attributed with over $5,000,000 in loss, based on calculations from individual victims from the EDVA skimming trip and over 9,000 unique card numbers identified in an e-mail account that was associated with him. Notably, the previous investigation included seizures of at least two laptops – one containing 642 unique access devices (totaling $321,000 in losses) and one containing 212 unique access devices (totaling $106,000 in losses).

The significant takeaway from the previous investigation should be that the losses in the instant case are very conservatively calculated. The previous case was only **a snapshot** of the damage this organization could do in **one location** over a **short period of time**.  That said, the sentences imposed in the previous case, despite being based on only one skimming trip, were in most instances fairly significant given their advisory guideline ranges and the loss amounts attributable to them.

Defendants Anyelo Ayala and Luis Diaz have both been sentenced to-date in the instant matter[3]. PSR ¶¶ 8, 11. Namely, Diaz who was a part of the conspiracy for less than a year, received a 38-month sentence. PSR ¶ 1. The sentence imposed in the defendant's case should adequately reflect that he recruited Diaz to the Enterprise and participated in two skimming trips prior to inviting Diaz into the group. PSR ¶ 25.

This case, unlike the one that preceded this one, captures the **entirety of this organization's conduct**. A RICO conspiracy is designed to punish not only the individual acts of racketeering charged, but the existence of organized criminal activity. "Concerted action both increases the likelihood that the criminal object will be successfully attained and decreases the probability that the individuals involved will depart from their path of criminality." *Callanan v. United States*, 364 U.S. 587, 593 (1961). Thus, organized crime poses a significant threat to our community, not just physically, but financially. Here, additional investigation has revealed that the scope of the enterprise was much larger than previously known. The sentences imposed for members of this enterprise engaged in organized financial crime, the consequences of which were nationwide, must adequately capture the scope of their conduct. Therefore, given these considerations, a guideline sentence for this defendant is more than reasonable.

G. The Need to Provide Restitution (18 U.S.C. § 3553(a)(7))

In the plea agreement, the defendant agreed that restitution was mandatory, and to the entry of a restitution order in the full amount of the victim's losses. Dkt. No. 199 at ¶ 10. Furthermore, as part of the plea agreement entered in this case, the defendant agreed that the Court may defer the imposition of restitution until after sentencing and specifically waives the 90-day provision found at Section 3664(d)(5) and consents to the entry of any orders pertaining to restitution after

---

[3] In each case, the government requested a sentence within the advisory guideline range.

sentencing without limitation. *See id*. To-date the government is still working with victim-witness services to identify victims and finalize figures attributable to the conduct committed by the defendant and his co-conspirators, not otherwise accounted for by previous Restitution Orders entered in related cases.

Therefore, the government requests that the Court bifurcate restitution in this matter pursuant to 18 U.S.C. § 3664(d)(5), which allows restitution to take place within 90 days after the sentencing hearing. If the Court grants this request, the government further requests that this Court address at the sentencing hearing whether the defendant will waive his presence at any subsequent proceeding(s) regarding restitution. If he does not, then the government would request that he remain in local custody and not be transferred to the BOP until restitution is finalized.

## VI.    Supervised Release Conditions

To comply with the Fourth Circuit's decision in *United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020), and *United States v. Singletary*, 984 F.3d 341 (4th Cir 2021), the government requests that the Court orally pronounce all conditions of supervised release other than those specifically designated as mandatory under 18 U.S.C. § 3583(d).  In addition to an oral pronouncement of the individual conditions, compliance with *Rogers* may be achieved by oral reference on the record to another document, such as the PSR.  *Rogers*, 961 F.3d at 299.  Here, the U.S. Probation Office has outlined its recommended supervised release conditions on pages 18 through 20 of the PSR, including mandatory, standard, and special conditions.  In addition to those conditions, the government requests a condition prohibiting the defendant from obtaining employment where he would have access to the PII of others.

14

**VII.     Conclusion**

For the reasons stated above, the government submits that a sentence within the advisory guideline range would be sufficient but not greater than necessary to accomplish the purposes of sentencing set forth in 18 U.S.C. § 3553(a).

Erik S. Siebert
United States Attorney

By:  _____/s/_____
Kristen S. Taylor
Assistant United States Attorney
Pennsylvania State Bar No. 326039
101 West Main Street, Suite 8000
Norfolk, Virginia 23510
Tel. - 757-441-6331
Fax - 757-441-6689
E-mail Address – Kristen.taylor2@usdoj.gov

_____/s/_____
Ben Tonkin
Trial Attorney
Violent Crime & Racketeering Section
U.S. Department of Justice
Washington, DC 20530
Tel. - 202-514-3594
E-mail Address – Ben.Tonkin@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 23, 2025, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send a notification of such filing (NEF) to counsel of

record who are users of the CM/ECF system.

I further certify that on May 23, 2025, I will send an electronic copy of the foregoing to

the following:

> Jeffrey Noll
> Senior United States Probation Officer

 

> _____/s/_____
> Kristen S. Taylor
> Assistant United States Attorney
> 101 West Main Street, Suite 8000
> Norfolk, Virginia 23510
> Tel. - 757-441-6331
> Fax - 757-441-6689
> E-mail Address – Kristen.taylor2@usdoj.gov