IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

*Norfolk Division*

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | No. 2:24-cr-28 |
| PEDRO RAUL ZEQUEIRA ALVAREZ, | |
| Defendant. | |

## **DEFENDANT PEDRO ALVAREZ'S POSITION ON SENTENCING**

Defendant Pedro Alvarez now submits his position on sentencing and requests a downward variance to 18 months' imprisonment. This sentence would be sufficient, but not greater than necessary, to satisfy the factors laid out in 18 U.S.C. § 3553(a). Mr. Alvarez's role in the offense was limited to cash-out operations using cloned credit cards. He's committed to his family. His entire criminal history is limited to this conspiracy from six to seven years ago. He's never suffered from substance abuse or other health issues. There's zero risk he recidivates. And he's less culpable than his co-conspirators who have correctly received significant downward variances.

The guidelines range is 41–51 months' imprisonment, stemming from a Total Offense Level of 22 and a Criminal History Category I, as Mr. Alvarez incurred zero criminal history points.

The parties agreed to reduce the total loss amount to $3.5 million or less—still unfairly high for someone in Mr. Alvarez's relatively minor position, but nonetheless accurately calculated under the draconian provision in § 2B1.1(b)(1) and Application Note 3(F)'s charge to value each unauthorized access device at $500.

The government objects to the probation officer's decision not to assess a two-point

enhancement for the use of sophisticated means under § 2B1.1(b)(10)(C). We will first explain why that objection should be overruled, then discuss the potential for a small downward departure for Mr. Alvarez's serving a 61-day sentence on related conduct, and finally turn to the sentencing factors.

**I.     The sophisticated-means enhancement does not apply because Mr. Alvarez did not personally engage in or cause the conduct constituting sophisticated means.**

The government mistakenly argues that "the defendant's role of traveling to various states and cashing out cloned credit cards at numerous retail stores for close to a year meets the standard for an enhancement for sophisticated means." PSR at 23. To be sure, the overall scheme involved sophisticated means, and the co-conspirators who personally installed and removed the gas-station skimming devices correctly received this enhancement. But the government acknowledges that Mr. Alvarez did not participate in that part of the conspiracy. And the guidelines make clear that the enhancement can only apply when "the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(1)(C). Because what Mr. Alvarez did—travel via airplane and vehicle, carry cloned credit cards, and use those credit cards to purchase items at stores—does not come close to "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense," U.S.S.G. § 2B1.1 cmt. 9(B), the Court should overrule this objection.

This enhancement applies if the government establishes that two elements are met: first, "the offense otherwise involved sophisticated means," and second, "the defendant intentionally engaged in or caused the conduct constituting sophisticated means." U.S.S.G. § 2B1.1(b)(10)(C); *United States v. Adepoju*, 756 F.3d 250, 257 (4th Cir. 2014) (noting that the government bears the burden of establishing this enhancement applies).

The second element of the sophisticated means enhancement requires that the defendant

2

himself used sophisticated means. Before November 1, 2015, "courts had applied this enhancement on the basis of the sophistication of the overall scheme without a determination of whether the defendant's own conduct was 'sophisticated.'" U.S. Sent'g. Comm'n, 2015 Amendments 25 (Apr. 30, 2015) (discussing Amendment 792). But concluding that "basing the enhancement on the defendant's own intentional conduct better reflects the defendant's culpability," the Commission inserted the text providing that the guideline only applies if "the defendant himself intentionally engaged in or caused the conduct constituting sophisticated means." *Id.*; *see* U.S.S.G. § 2B1.1(b)(10)(C). So even if a conspiracy involved sophisticated means, courts may not impose the enhancement on a defendant whose own actions did not involve sophisticated means. *See, e.g.*, *United States v. Hess*, 106 F.4th 1011, 1034–35 (10th Cir. 2024) (finding district court erred in applying sophisticated means enhancement to defendant who was involved in the customer-facing role and not the sophisticated, behind-the-scenes conduct).

In short, ten years ago the Sentencing Commission rejected the government's argument that "facilitate[ing] and help[ing] conceal the fraudulent nature of the scheme" is enough to trigger the enhancement. Either the defendant did it himself, or he didn't. Mr. Alvarez didn't, so the enhancement doesn't apply.

The government further contends that Mr. Alvarez's own conduct was sophisticated. Not so. What the government describes—"traveling to various states and cashing out cloned cards at numerous retail stores for close to a year," PSR at 23—falls well short of the "especial complexities and intricacies" that "involve[ ] more than the forgeries, misrepresentation, and concealment inherent in … fraud." *Adepoju*, 756 F.3d at 257. The government's proposed definition of sophisticated means would render the Sentencing Commission's express limitation meaningless. The Court should decline to adopt it and instead overrule the objection.

3

## II. Mr. Alvarez warrants a modest downward departure for severing a 61-day sentence based on relevant conduct.

In fashioning Mr. Alvarez's sentence, the Court should grant a 61-day downward departure based on his discharged term of imprisonment on related conduct. *See* PSR ¶ 46. Under § 5K2.23, "[a] downward departure may appropriate if the defendant (1) has complete serving a term of imprisonment; and (2) subsection (b) of § 5G1.3 … would have provided an adjustment had that completed term of imprisonment been undischarged at the time of sentencing for the instant offense." *See* PSR ¶ 69. Section 5G1.3(b), which applies to an undischarged "term of imprisonment result[ing] from another offense that is relevant conduct to the instant offense," in turn says that a sentencing court "shall adjust the sentence for any period of imprisonment already served on the undischarged term of imprisonment if the court determines that such period of imprisonment will not be credited to the federal sentence by the Bureau of Prisons."

In other words, the Court should determine whether BOP will credit the 61 days Mr. Alvarez served on the related state court sentence toward his federal sentence. If it does, that's the end of the endeavor. If not, the Court should depart downward by that amount of time. In practice, BOP seems to consistently credit time on related discharged terms of imprisonment. In the unlikely event that doesn't happen here, we ask the Court to depart downward accordingly. The remaining reduction from the guidelines should come in the form of a variance.

## III. The Sentencing Factors

In imposing its sentence, the Court must first correctly calculate the applicable guidelines range. *Peugh v. United States*, 569 U.S. 530, 536 (2013). Then, although "the Guidelines should be the starting point and the initial benchmark," the Court "must … consider the arguments of the parties and the factors set forth in § 3553(a)." *Id.* Courts "may not presume that the Guidelines range is reasonable," *id.*, and "must make an individualized assessment based on the facts

4

presented," *Gall v. United States*, 552 U.S. 38, 50 (2007). Thus, although sentencing courts must continue to consider the Guidelines, Congress has required federal courts to impose the least amount of imprisonment necessary to accomplish the purposes of § 3553(a). In passing judgment, "[i]t has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996).

      **A.**    **Mr. Alvarez's history and characteristics show that his participation in this conspiracy is an unfortunate aberration from an upstanding life.**

The criminal conduct described in the PSR and Statement of Facts is not representative of Mr. Alvarez's true character. He shows who he is through his close relationship with his family and friends and through overcoming harsh conditions in Cuba to flourish in the United States. He "was born in Camaguey, Cuba." PSR ¶ 51. His parents raised him and his half-sister in there, and they "gave him everything he needed." *Id.* "[H]e had a 'perfect' childhood" without "physical or mental abuse in the home." *Id.*



- Age 9 with his mother and sister    • Age 10 with his father    • Age 12 with his cousin

Mr. Alvarez immigrated to the United States in 2016 because "the political situation is really bad in Cuba" and he was "looking for a better place to live and work." PSR ¶ 53. He's lived in Miami since then. His parents and half-sister joined him there in 2021 "after their jobs were taken away from them by the Cuban government." *Id.* His father "is employed as a building manager" while his mother "is employed in the finance department for th[at] same company." PSR ¶ 52. Mr. Alvarez's half-sister "is employed as a nail technician." *Id.* His family's records are spotless—"no other family member has a criminal record or a history of substance abuse." *Id.*

Mr. Alvarez's love for his family is what drives him to be a better person. In the first picture below, Mr. Alvarez (center) is posing with his father (next to him on the right), two cousins, and aunt at the Miami airport when his father first arrived in the United States. And in the second picture, Mr. Alvarez, age 19, is posing with his paternal grandfather.



Mr. Alvarez "was always a good kid who loved the arts," especially drawing," as well as tattooing and music. PSR ¶ 51. He's continued developing his drawing skills, showing that he's much more than just the criminal the government makes him out to be:



Unlike most, if not all, of his co-defendants, Mr. Alvarez's criminal history is limited to his involvement in this conspiracy for eleven months between 2018 and 2019—six to seven years ago. The only prior charge he ever faced was for a subset of the same crime hailing him into this court: a "conspiracy" lasting "between October 2018 and December 2019" taking place in "Placer County, CA" while on one of the trips identified in the Statement of Facts, ¶¶ 32–34, and in the

PSR, ¶¶ 24, 46. And even that charge was the subject of "early dismissal from probation, reduced to a misdemeanor and dismissed" because of his good behavior while on probation. PSR ¶ 46.

Mr. Alvarez had a clean record before he joined this conspiracy in May 2018, and he hasn't committed a crime, or even a driving offense, since leaving it roughly six years ago. He was arrested on the California charge on September 30, 2020, more than a year after he had stopped participating in this scheme. But by that time, he had already made up his mind that he'd never run afoul of the justice system again. His time in federal custody has only reinforced that position.

Mr. Alvarez demonstrated his respect for the law throughout this case. He was nothing but compliant with conditions of release before he was ordered detained pretrial. Although he was released in New York City before he could execute a bond, he promised he'd take care of it when he returned to Florida. He traveled, completely unsecured, to his home in Miami where, on his own accord, he executed the bond documents. He then promptly reported to the Southern District of Florida's pretrial services office and surrendered his passport. Then he voluntarily flew to Norfolk to participate in the hearing on the government's motion to revoke the Southern District of New York's release order and didn't complain when he was again detained. He pleaded guilty, takes no issue with government's description of the overarching scheme or his role in that scheme, and accepts responsibility for his actions—actions from more than half a decade ago.

What's more, throughout his life, Mr. Alvarez has lived a healthy and clean lifestyle. "[H]is overall general health is good and he is not prescribed any medications." PSR ¶ 57. He drinks alcohol only socially, stays away from drugs, and "has never attended substance abuse treatment." PSR ¶ 59. He also has "no history of psychological or psychiatric treatment and there is no documented evidence to suggest otherwise." PSR ¶ 58.

Mr. Alvarez's true character is revealed not by this relatively brief period of wrongdoing,

but by the dedication he has shown to his family, the honorable traits he's developed throughout his life, his clean lifestyle and otherwise clean criminal record, and his success in turning away from crime six years ago and remaining on the straight and narrow path since then.

**B.     The nature and circumstances of the offense when focusing just on Mr. Alvarez, not the overarching scheme, support the recommended sentence.**

Mr. Alvarez is being sentenced because he helped his co-conspirators in a gas station skimming conspiracy by traveling to various locations, taking credit cards that had already been cloned by his co-conspirators, buying merchandise or cashing the cards out at stores, and returning much of the money to those co-conspirators. He had no role in identifying target gas stations, installing or uninstalling skimmers, extracting the data from the skimmers, transferring the data to cloned credit cards, or fencing the unlawfully obtained items.

Mr. Alvarez's strong ties to his family, unfortunately, also led to his involvement in this conspiracy. His brother-in-law, Eduardo Rodriquez, recruited him. He did not seek out a get-rich-quick scheme; he erroneously put his trust in the wrong family member. And then he kept working for Rodriguez after he figured out it was wrong to do so. That's why he's being punished. But the circumstances under which Mr. Alvarez became involved in the offense are mitigating and not taken into account by the guidelines range.

To be sure, Mr. Alvarez "recruited Diaz into the scheme after [he] had already gone on two trips." PSR ¶ 25. Although Mr. Alvarez split the cloned cards with Diaz, and "[t]hey would both go out with 10 to 15 cards each day," Diaz wasn't satisfied—he "wanted to get more cards." Mr. Alvarez said no—"they were at the bottom of the totem pole." *Id.* Another witness corroborated Mr. Alvarez's relatively minor role: he "was not one of the most heavily involved members." PSR ¶ 25.

Indeed, although Mr. Alvarez's conduct doesn't meet the requirements for a minor-role

reduction, he was used by much more sophisticated people like Rodriguez and Yasmani Quijada. He was manipulated, and he didn't gain much from the scheme, particularly in light of the millions of dollars in loss amount that the government contends the conspiracy is responsible for. We know that's true because he "gave [the] money back to the conspirators to split up the proceeds." PSR ¶ 25. The PSR also makes clear that Mr. Alvarez has no money to show for his participation in the conspiracy.

We thus ask the Court to ensure via a downward variance that Mr. Alvarez's sentence reflects his lower culpability.

### C.     Mr. Alvarez will not reoffend.

The Court must consider whether the sentence is sufficient to deter Mr. Alvarez from future crime and whether it will protect the public from the risk of recidivism. An 18-month sentence easily accomplishes that goal. Mr. Alvarez took concrete and definitive steps to bring himself into an honorable condition back in 2019 and just keeps improving, even while in custody for that years-old conduct. He will continue on this path of honest living after sentencing regardless of what the Court does.

### D.     The need to avoid unwarranted sentencing disparities among co-conspirators points to the recommended sentence.

Another important factor that the Court must consider is the need to avoid unwarranted sentencing disparities. Two of Mr. Alvarez's co-defendants have been sentenced. Mr. Alvarez warrants a lesser sentence than either of them.

- Anyelo Ayala received a 36-month sentence—a downward variance of 27 months. He was more involved in the conspiracy—he not only participated in the cash-out operations, but he also searched for gas stations and personally installed skimming devices, warranting the sophisticated-means enhancement. He's responsible for a greater loss amount than Mr.

11

Alvarez. He was arrested in May 2019 while in possession of access devices and in the middle of carrying out the scheme, while Mr. Alvarez had been out of the conspiracy for 14 months at the time of his arrest—longer than the time he actually spent in the conspiracy. And Ayala regularly possessed and used unlawful controlled substances.

- Luis Diaz was sentenced to 38 months' imprisonment—a downward variance of 13 months. Although Mr. Alvarez recruited Diaz "after he had already gone on two trips," PSR ¶ 25, Diaz was older than Mr. Alvarez, "wanted to get more cards" than Mr. Alvarez, and didn't dispute that the sophisticated-means enhancement should apply to his guidelines calculation. Diaz also has a history of brushes with law enforcement. That includes a July 2016 encounter with police officers who found him at a gas pump that had been closed down for the evening. Diaz was near tools consistent with installing a skimming device, down to a drill bit matching exactly what's necessary to open the gas pump, which suggests that Diaz had been involved in gas-station skimming schemes much longer than Mr. Alvarez.

Other co-conspirators who were more culpable than Mr. Alvarez also received sentences that are consistent with our recommendation:

- Pedro Duran, one of the conspiracy's leaders, was sentenced to 30 months in prison and served only 15 months.

- Luis Cardente was sentenced to 40 months on the fraud conspiracy count and a consecutive 24 months for aggravated ID theft, but ended up serving a little over 42 months total.

- Yariel Ruiz was sentenced to 19 months in prison and served a little over 15 months.

- Denis Diaz was sentence to 37 months in prison and served a little over 26 months.

- Jorge Fuentes was sentenced to 36 months for bank fraud and 24 months consecutive for aggravated ID theft and served a little over 37 months total.

- Guillermo Fuentes was sentenced to 23 months on a bank-fraud count and 24 months

12

consecutive for aggravated ID theft, and he served 30 months total.

- Denis Diaz was sentenced to 37 months' imprisonment and served a little over 26 months.

- Yasmani Quijada, the primary leader, is the lone exception—he was sentenced to 96 months on a bank-fraud count and 24 months consecutive for aggravated ID theft, and he ended up serving a little over 93 months total.

Mr. Alvarez's guidelines range exceeds the sentences that most of his co-conspirators received, particularly co-conspirators far more culpable than him. To avoid unwarranted sentencing disparities, the Court should follow the pattern it has established for the other defendants in this case and vary downward. An 18-month sentence will account for all Mr. Alvarez's mitigating factors that did not apply to his co-conspirators' sentences and will thus be consistent with those sentences.

*   *   *

For all these reasons, the defense respectfully requests a sentence of 18 months' imprisonment.

Respectfully submitted,

Pedro Raul Zequeira Alvarez

By: _____/s/_____
William B. Jackson (VSB No. 84012)
Jackson Lewis P.C.
500 E. Main St., Suite 800
Norfolk, Virginia 23510
Telephone: (757) 648-1445
Fax: (757) 648-1418
billy.jackson@jacksonlewis.com


By: _____/s/_____
Juan de Jesus Gonzalez
Pro Hac Vice Pending
2460 SW 137 Ave., Ste. 254
Miami, FL 33175
(305) 596-4500 Telephone
(305) 596-4515 Facsimile
JuanGonzalezLaw@aol.com

## **CERTIFICATE OF SERVICE**

I certify that on this 23rd day of May, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to all counsel of record.

/s/
William B. Jackson (VSB No. 84012)
Jackson Lewis P.C.
500 E. Main St., Suite 800
Norfolk, Virginia 23510
Telephone: (757) 648-1445
Fax: (757) 648-1418
billy.jackson@jacksonlewis.com